**SO ORDERED.**

**SIGNED this 17 day of August, 2010.**

_____
**JAMES D. WALKER, JR.**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | CASE NO. 09-52242-JDW |
| SHIRLEY ANNE NOBLES, | ) | |
| | ) | |
| DEBTOR. | ) | |
| | ) | |
| WILLIAM M. FLATAU, TRUSTEE, | ) | ADVERSARY PROCEEDING |
| | ) | NO. 09-5106 |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| CURINGTON, LLC, | ) | |
| | ) | |
| DEFENDANT. | ) | |

BEFORE

JAMES D. WALKER, JR.

UNITED STATES BANKRUPTCY JUDGE

COUNSEL

For Plaintiff:        William M. Flatau
                      355 Cotton Avenue
                      Macon, Georgia 31201

For Defendant:        Daniel Wilder
                      544 Mulberry Street
                      Macon, Georgia 31201

**MEMORANDUM OPINION**

This matter comes before the Court on Plaintiff's complaint to recover a preference.  This

is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(F).  After considering the pleadings,

the evidence, and the applicable authorities, the Court enters the following findings of fact and

conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

**Findings of Fact**

In February 2009, Debtor Shirley Anne Nobles' home was damaged by fire.  The

structure of her home and various personal items were affected.  In addition, certain items of

personal property were destroyed, including two sofas, a chair, an end table, curtains, a water

heater, and a stove.  On February 24, 2009, Debtor and Curington LLC entered into a contract

under which Debtor authorized Curington to "perform any and all necessary cleaning and/or

restoration services" on Debtor's personal property. (Plaintiff's ex. 1.)  The contract provided for

payment "immediately upon [Debtor's] receipt of the [insurance] check."  (Plaintiff's ex. 1.)  It

also provided, "If any amounts owing to Provider for Provider services are not covered by

insurance, Client agrees to pay those amounts to Provider within fifteen (15) days of Client's

receipt of invoice." (Plaintiff's ex. 1.)  The contract did not indicate the cost of services.  Debtor

testified that at the time of signing the contract she asked Michael Curington, the owner of

Curington LLC, how much the company would be charging her, and he responded that her

insurance company would pay him.

On March 25, 2009, Mr. Curington prepared a detailed estimate for its services, totaling

$26,879.25, which it submitted to an adjustor for Debtor's insurance company.  Debtor did not

receive a copy of the estimate.  By April 7, 2009, Curington finished cleaning most of Debtor's

furniture and returned it to her over the course of the following two to three weeks.

On April 27, 2009, Mr. Curington contacted Debtor's insurance company to inquire about

payment.  He learned a check made out solely to Debtor had been forwarded to Debtor's

insurance agent. On May 1, 2009, Curington prepared an invoice showing the amount due for the

services provided to Debtor.  Although Mr. Curington said he mailed the invoice to Debtor, she

testified she did not receive it.  Also on May 1, 2009, Debtor received a proceeds check from her

insurance agent for  $32,000.  She deposited $30,000 into her bank account and used the

remaining $2,000 to begin  replacing items destroyed in the fire.  Debtor testified that she

believed the insurance company would pay Curington directly and that the $32,000 was issued to

replace items that had been destroyed by the fire.  Debtor's belief was due in part to Mr.

Curington's prior statement to her that the insurance company would pay him and due in part to

her insurance agency telling her the check was her money.

On the afternoon of Thursday, May 14, 2009, the parties engaged in a series of phone

calls.  First, Mr. Curington contacted Debtor to ask whether she had received the insurance

proceeds.  Debtor told him she received a check, but she did not believe any of the money was

intended to compensate Curington.[1]  Immediately after that conversation, Mr. Curington called

Debtor's insurance company and discovered Debtor had received $32,000.  Mr. Curington then

called Debtor again and told her the money she received included the cost of his services.  Debtor

---

[1] According to Debtor's testimony, no one from the insurance company advised her of
how much it would pay to cover replacement of destroyed property versus how much it would
pay to cover the repair of damaged property.  As a result, she did not recognize the $32,000 as
approximating her total loss for personal property.

told Mr. Curington she had never received a bill from him and did not even know how much was owed. Mr. Curington told her the balance due on the account and urged her to contact her insurance agent. Debtor did so and learned the $32,000 included money to pay Mr. Curington. Debtor then called Mr. Curington and told him she had spent some of the money but could pay him $15,000 and would try to get a loan to pay the balance.

The next time the parties talked was four days later on the morning of Monday, May 18, 2009. Debtor called Mr. Curington, told him she could pay $20,000, and agreed that he could come by her house that morning for the payment. When Mr. Curington arrived, Debtor gave him the check for $20,000, and he gave her an invoice. The payment and balance due was recorded on the invoice with a handwritten notation. At that time, Mr. Curington again refused to accept installment payments for the balance.

Over the following several weeks, Mr. Curington's efforts to contact Debtor went unanswered. As a result, he filed a state court action against her in June 2009. The Court has no facts about the lawsuit other than an entry in Curington's phone log that it received a judgment in its favor by mail on August 17, 2009. By that time, Debtor had already sought bankruptcy protection by filing a Chapter 7 petition on July 19, 2009.

The Chapter 7 Trustee filed a complaint to recover the $20,000 payment as a preference. After denying the Trustee's motion for summary judgment, the Court held a trial on July 16, 2010. Having considered the evidence and legal arguments, the Court will enter judgment for Curington.

## Conclusions of Law

When a debtor pays a creditor on the eve of bankruptcy, the Bankruptcy Code provides

for avoidance of that payment in certain circumstances as set forth in 11 U.S.C. § 547:

> (b) Except as provided in subsections (c) and (I) of this section, the
> trustee may avoid any transfer of an interest of the debtor in
> property–
>> (1) to or for the benefit of a creditor;
>> (2) for or on account of an antecedent debt owed by the
> debtor before such transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made–
>>> (A) on or within 90 days before the date of the filing
> of the petition; or
>>> (B) between ninety days and one year before the
> date of the filing or the petition, if such creditor at the time of such
> transfer was an insider; and
>> (5) that enables such creditor to receive more than such
> creditor would receive if–
>>> (A) the case were a case under chapter 7 of this title;
>>> (B) the transfer had not been made; and
>>> (C) such creditor received payment of such debt to
> the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The burden is on the Trustee to prove the elements of a preference. Id. § 547(g). In this case, most of the elements are undisputed. The payment benefitted Curington because it was for services provided by Curington. The payment was for an antecedent debt because the services were provided approximately 2 ½ months prior to payment. The payment was made within 90 days prior to the petition date, while Debtor was presumed insolvent under § 547(f). Finally, the Trustee provided an affidavit indicating only $325 is available for distribution to unsecured creditors holding $14,970.55 in claims; thus, the $20,000 payment greatly exceeds what Curington would receive in a hypothetical liquidation.

Curington raised three defenses to the preference. First, it argued the payment was subject to a constructive trust in favor of Curington. Thus, the transfer was not of an interest of

Debtor in property.  Second, Curington raised an affirmative defense that the transfer was made

in the ordinary course of business.  Third, Curington argued the payment was made

contemporaneously with the provision of services.  Curington abandoned the contemporaneous

exchange defense at trial.  Therefore, the Court need only consider whether Debtor transferred

her property and whether the transfer was made in the ordinary course of business.

An Interest of the Debtor in Property

Curington argues Debtor had no interest in the money transferred because it was held in

constructive trust for Curington.  Under Georgia law, a constructive trust is a type of implied

trust.  O.C.G.A. § 53-12-2(5) (2010).[2]  A constructive trust may be imposed "whenever the

circumstances are such that the person holding legal title to property, either from fraud or

otherwise, cannot enjoy the beneficial interest in the property without violating some established

principle of equity."  Id. § 53-12-132(a).  The Georgia Supreme Court has described a

constructive trust as a remedy to prevent unjust enrichment.  St. Paul Mercury Ins. Co. v. Meeks,

270 Ga. 136, 137, 508 S.E.2d 646, 648 (1998).  It generally applies when the debtor wrongfully

obtains the property at issue.  See Aero Housewares, LLC v. Interstate Restoration Group, Inc.

(In re Aero Plastics, Inc.), No. 05-60451-MHM, 2006 WL 6589869, at *4 (Bankr. N.D. Ga. Sept.

28, 2006) (citing Bateman v. Patterson, 212 Ga. 284, 285, 92 S.E.2d 8, 10 (1956)).[3]  In other

---

[2] Title 53 of the Georgia Code, which governs trusts, underwent significant revisions effective July 1, 2010.  Although the revisions resulted in renumbering of sections related to constructive trusts, the substance of those provisions is unchanged.  Therefore, case law interpreting those provisions remains viable.

[3] By contrast, a resulting trust–another form of implied trust–arises when no party intended the holder of legal title to property to also hold a beneficial interest in the property.  O.C.G.A. § 53-12-130; see also Tidwell v. Hendricks (In re McDowell), 258 B.R. 296, 301-03 (Bankr. M.D. Ga. 2001) (finding an implied trust when a loan was made for a specific purpose

7

words, Curington must have an interest in the proceeds that was in some way undermined or

usurped by Debtor's fraudulent or inequitable conduct, such as fraudulently inducing Curington

to provide her with services.[4]  Debtor's right to the proceeds was established by her insurance

policy.  Although the contract between Debtor and Curington contemplates payment upon

Debtor's receipt of the insurance proceeds, it in no way purports to transfer Debtor's interest in

the proceeds to Curington by assignment or other means.  Because a mere contractual right to

payment does not by itself give rise to a constructive trust over the expected source of funds for

payment, the Court finds no basis for finding the insurance proceeds were subject to a

constructive trust.  Instead, they were property of Debtor.  Thus, the $20,000 payment to

Curington consisted of a transfer of an interest of Debtor in property, and the Trustee has proved

a prima facie case for a preference.

Ordinary Course of Business

The Bankruptcy Code provides an affirmative defense to preference claims for transfers

made in the ordinary course of business.

> (c) The trustee may not avoid under this section a transfer–
> ...
> (2) to the extent that such transfer was in payment of a debt
> incurred by the debtor in the ordinary course of business or
> financial affairs of the debtor and the transferee, and such transfer
> was--
> (A) made in the ordinary course of business or

---

and when the debtor had no right to put the loan proceeds to any other use).

[4] Even assuming Debtor fraudulently induced Curington to enter into the contract with knowingly false promises to turn over insurance proceeds, Curington waived its right to a constructive trust by suing Debtor in state court for the balance due on the contract.  Ekeledo v. Amporful, 281 Ga. 817, 819, 642 S.E.2d 20, 22 (2007) (citing O.C.G.A. § 53-12-93(b), recodified at § 53-12-132(b)).

> financial affairs of the debtor and the transferee; or
> (B) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2).  Curington bears the burden to prove the ordinary course of business

defense.  Barrett Dodge Chrysler Plymouth, Inc. v. Cranshaw (In re Issac Leaseco, Inc.), 389 F.3d

1205, 1210 (11th Cir. 2004).  To succeed, Curington must show the debt related to the

transaction was incurred in the ordinary course of business and that the payment was either

ordinary between the parties or ordinary in relation to industry standards.[5]

First, the Court must consider how the debt was incurred.  The testimony of the parties

indicate it was the result of an arm's-length transaction with a legitimate purpose.  See Weathers

v. Spartan Polymers, Inc. (In re Firstline Corp.), No. 06-70145, Adv. No. 07-7019, 2008 WL

2246902, at *3 (Bankr. M.D. Ga. May 29, 2008) (Walker, J.).  Debtor's personal property was

damaged by fire.  She hired Curington to provide services to restore her property, which is part of

its normal business operation.  Based on these facts, the Court is satisfied Curington has proved

the first element of its defense.

Next, the Court must consider the manner of payment–whether it was ordinary between

the parties or ordinary according to industry standards.  Curington has offered no evidence as to

industry standards.  Therefore, it can only prevail if it shows the payment was "made in the

ordinary course of business or financial affairs" between the parties.  Because transaction in this

case was the first one between the parties, the Court has no historical record for testing the

ordinariness of the payment.  Nevertheless, Curington may still prove the applicability of the

---

[5] Prior to amendments enacted in 2005, defendants were required to prove all three
elements of the defense.  Now, they must prove two.  However, the relevant language of the
statute remains unchanged, and the Court may rely on prior case law interpreting that language.
5 Collier on Bankruptcy ¶ 547.02[2] (16th ed. 2010).

defense.  "Where parties have no extensive history of credit transactions to which a disputed

payment can be related, their express agreement furnishes 'the most informative evidence left to

consider' of the ordinariness of a transaction from the parties' perspective."  Carrier Corp. v.

Buckley (In re Globe Mfg. Corp.), 567 F.3d 1291, 1298 (11th Cir. 2009) (quoting Logan v. Basic

Distrib. Corp. (In re Fred Hawes Org., Inc.), 957 F.2d 239, 245 (6th Cir. 1992)).

    This Court previously has held that payments timely made according to contract terms in

a retail installment contract for a motor vehicle were made in the ordinary course of business.

Kelley v. Chevy Chase Bank (In re Smith), 238 B.R. 879, 880 (Bankr. M.D. Ga. 1999) (Walker,

J.).  In Smith, the payments at issue were the first two payments under the contract.  In a prior

decision in the case, the Court noted that the ordinary course defense applies "even if it is the

first transaction between the debtor and the creditor, so long as it is a 'normal financial relation'

and not an 'unusual action' undertaken during the 'slide into bankruptcy.'"  Kelley v. Chevy

Chase Bank (In re Smith), 236 B.R. 91, 102 (Bankr. M.D. Ga. 1999) (Walker, J.) (quoting Gosch

v. Burns (In re Finn), 909 F.2d 903, 907-08 (6th Cir. 1990)).  By contrast, this Court rejected the

ordinary course defense with respect to a first time transaction when the contract required

payment within 30 days of the invoice, but the payment was not made until 106 days after the

invoice.  Firstline Corp., 2008 WL 2246902, at *1, 4.

    The Trustee has argued the payment in this case is not ordinary for three reasons.  First,

Curington engaged in unusual collection efforts by contacting Debtor's insurance company,

calling the Debtor to ask when she would be submitting payment, and going to Debtor's house to

pick up the payment.  Second, the timing of the payment was inconsistent with the contract terms

that required payment immediately upon Debtor's receipt of insurance proceeds.  Third, the

amount of the payment was inconsistent with the contract terms that required payment in full.

The Court finds none of these arguments persuasive.

As to Curington's collection efforts, some courts have refused to apply the ordinary

course defense in the face of unusual collection activities by the creditor.  However, those

activities generally include some specific economic threat to the debtor.  See Precision Walls,

Inc. v. Crampton, 196 B.R. 299, 304-05 (E.D.N.C. 1996) (threat by subcontractor to general

contractor to seek payment from owner was sufficiently unusual to bar ordinary course defense as

to resulting payments); Xtra, Inc. v. Seawinds, Ltd. (In re Seawinds, Ltd.), 888 F.2d 640, 641 (9th

Cir. 1989) (payments made in response to contract termination, demand for return of equipment,

and increased rates on remaining equipment were outside of ordinary course); Brown v. Heigel

Lumber & Hardware (In re Mid-South Cabinet & Millwork, Inc.), 125 B.R. 16 (Bankr. E.D. Ark.

1990) (payments made after threat to suspend credit was outside of ordinary course); Schwinn

Plan Committee v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle Co.), 205 B.R. 557, 572-73

(Bankr. N.D. Ill. 1997) (payments made after threats to suspend shipments were the result of

unusual collection activity and outside the ordinary course).  On the other hand, mere requests or

demands for payment do not take a transaction outside the scope of the ordinary course defense.

See Branch v. Ropes & Gray (In re Bank of New Engl. Corp.), 161 B.R. 557, 561-62 (Bankr. D.

Mass. 1993) (reminder letters about unpaid invoices did not constitute unusual collection efforts

and did not defeat the ordinary course defense); Harrison v. The Ink Spot (In re Rave Comm.,

Inc.), 128 B.R. 369, 373 (Bankr. S.D.N.Y. 1991) (reminder letters about the payment terms were

not unusual collection efforts outside the ordinary course of business, even when they included a

tacit threat to halt delivery of goods); McCarthy v. Navistar Fin. Corp. (In re Vogel Van &

Storage, Inc.), 210 B.R. 27, 35-36 (N.D.N.Y. 1997) (daily phone calls urging payment were not

unusual for purposes of the ordinary course defense in the absence of any economic threats).

In this case Mr. Curington contacted the insurance company on April 27, 2009, and

learned the insurance proceeds would be paid to Debtor.  On May 1, 2009, Curington prepared an

invoice and mailed it to Debtor–although she said she never received it.  On May 14, 2009, Mr.

Curington again contacted the insurance company and learned Debtor had received the insurance

proceeds on May 1.  Immediately following that conversation, Mr. Curington contacted Debtor.

Debtor indicated she had received money but she did not believe it was for Curington's services.

At that point, both Debtor and Mr. Curington contacted the insurance company.  Both were

informed the money Debtor received did include payment for Curington's services.  Debtor told

Mr. Curington she had spent some of the money and could pay him $15,000.  He refused her

request to pay the remainder in installments.  On May 18, Debtor said she could pay $20,000 and

that Mr. Curington could come pick it up.

The sort of transactions that arise as the result of a house fire are unlike everyday credit

transactions familiar to consumers.  The source of the creditor's payment is, in whole or in part,

insurance proceeds rather than the debtor's income or other assets.  In such circumstances,

Curington's phone calls to the insurance company were not unusual collection practices.  Instead,

Curington made the reasonable decision not to engage in any collection efforts until it was sure

Debtor had received her insurance proceeds.  The insurance company itself was the best source

of that information.  Subsequent phone calls were made to help clarify the scope of the proceeds

in the face of Debtor's confusion.  Debtor believed Curington was paid separately and directly

from the insurance company.  The insurance company was the only party that could set Debtor

straight.  Furthermore, these facts show no indication of coercion.  Curington made no threats

against Debtor–economic or otherwise–to induce the $20,000 payment.  Instead, Mr. Curington

simply demanded payment and refused to negotiate a payment schedule for any deficiency.  In

the circumstances, the Court concludes Curington's various phone calls to Debtor and her

insurance company were not out of the ordinary.

As to the timeliness of the payment, the contract provided for payment immediately upon

receipt of insurance proceeds and, to the extent insurance did not cover Curington's services, for

payment within 15 days of Debtor's receipt of an invoice.  In this case, Debtor did not learn she

owed Curington any money until her various conversations with Mr. Curington and her insurance

company on the afternoon and evening of May 14, 2009, which was a Thursday.  She made the

payment at issue on the morning of Monday, May 18, 2009, by personally handing a check to Mr.

Curington.  The Court finds that making a payment two business days after learning of the

existence and amount of a debt is sufficient to satisfy a contractual requirement for immediate

payment.

The last remaining issue is Debtor's failure to pay the full amount due under the contract.

A handful of cases have considered partial payments as a factor in refusing to apply the ordinary

course of business defense.  However, in these cases, partial payments are coupled with other

factors indicating the payment was not ordinary.  For example, in Ratnor Holdings Corp. v. PPT

Consulting, LLC (In re Ratnor Holdings Corp.), No. 06-10894, Adv. No. 08-51184, 2009 WL

2004226 (Bankr. D. Del. July 9, 2009), the debtor and creditor had a history of transactions in

which the debtor paid invoices in full within about 60 days on average.  In light of that history,

the court found payments that were both partial and late (more than 110 days after the invoice

date) to be outside the ordinary course of business.  Id. at *6.  See also Sweetapple Plastics, Inc.

v. Philip Shuman & Sons, Inc. (In re Sweetapple Plastics, Inc.), 77 B.R. 304, 312 (Bankr. M.D.

Ga. 1987) (payment was not ordinary when it was both partial and late according to the terms of

the contract).  In this case, the payment was neither untimely nor made after a history of full

payments.  Furthermore, the contract itself contemplates the possibility of two payments made at

different times–a payment immediately upon receipt of insurance proceeds and a payment for

services not covered by insurance made within 15 days after receipt of the invoice.  The

insurance company issued Debtor $32,000 for personal property loss without ever telling her how

it allocated the money for damage versus destruction.  Debtor used some of that money to replace

property that had been destroyed by the fire.  The remaining money was not sufficient to fully

cover Curington's fee.  Debtor paid what remained of the proceeds to Curington.  Even if partial

payment alone were enough to remove a payment from the ordinary course of business, the Court

cannot conclude the payment at issue was partial.  Instead, it represented a payment of available

insurance proceeds.  In accordance with the contract, the remaining balance could be paid

separately by Debtor.

Conclusion

The ordinary course of business defense "protect[s] those payments which do not result

from 'unusual' debt collection or payment practices."  Marathon Oil Co. v. Flatau (In re Craig

Oil Co.), 785 F.2d 1563, 1566 (11th Cir. 1986).  In this case, the Court finds nothing unusual

about the collection methods or the payment.  In addition, although the parties had no prior

history of transactions, the payment conformed with the terms of the contract.  For the foregoing

reasons, the Court finds Curington has met its burden to prove the payment was made in the

14

ordinary course of business.  Therefore, the payment is not a preference, and the Court will enter

judgment for Curington.

An Order in accordance with this Opinion will be entered on this date.

END OF DOCUMENT